556 So.2d 588 (1990)
DUPRÉ TRANSPORT, INC., et al.
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 89-CA-1486.
Supreme Court of Louisiana.
February 5, 1990.
*589 Robert L. Rieger, Jr., Baton Rouge, for defendant-appellant.
George M. Pierson, Baton Rouge, for intervenor-appellant.
Janet Boles, Boles, Boles & Ryan, Baton Rouge, for appellee.
COLE, Justice.
The issue is whether the Public Service Commission, acting reasonably upon the evidence before it, could have determined that issuance of a contract carrier[1] permit to Hydro-Walk Energy, Inc. was in the public's interest. LSA-R.S. 45:164. The district court cancelled and revoked the permit issued to Hydro-Walk by the Public Service Commission finding, primarily, that its issuance was an arbitrary and capricious act. On direct appeal, we affirm.

FACTUAL AND PROCEDURAL HISTORY
Hydro-Walk Energy, Inc., a petroleum and petroleum products wholesaler with three tractors and six trailers, applied to the Louisiana Public Service Commission (PSC) for a Certificate of Public Convenience and Necessity on February 18, 1988. Desiring to haul for hire, Hydro-Walk sought a contract carrier permit to operate as an intrastate contract motor carrier, authorizing the transportation of petroleum and petroleum products over irregular routes, statewide, under continuing contracts with five named shippers: Ida Gasoline Co., Inc.; Pel State Oil Co., Inc.; Clements Oil Corp.; Staggers Oil Co. and Bayou State Oil Corp.[2] The application recognized that Hydro-Walk would be restricted against the use of vacuum trucks and trailers.
Notice of the application was published in the PSC's Bulletin dated March 4, 1988. In response to this notice, oppositions protesting the issuance of the certificate were filed by Dupré Transport, Inc.; Stephens Truck Lines, Inc.; and the Louisiana Tank Truck Carriers, Inc. (collectively referred to as "protestants"). Dupré and Stephens, carriers holding certificates authorizing them to haul for hire intrastate, sought to protect their operating rights. They contended that existing carriers have under-utilized equipment and facilities available to move the petroleum commodities of Hydro-Walk's prospective shippers. They reasoned that with the market saturated, additional carriers are not presently needed.
On May 17, 1988, an evidentiary hearing regarding Hydro-Walk's opposed application was conducted before Hearing Examiner Joseph A. Chrisman. Hydro-Walk presented its financial and insurance documentation; the testimony of Hydro-Walk's president, Ronald G. Walker; and the testimony of representatives from its five prospective *590 shippers. Representatives of Stephens and Dupré testified against the need for an additional carrier, as did representatives of Jobbers Oil Transport Co., Inc. (Jocto), Groendyke Transport, Inc. and Younger Brothers, Inc. on behalf of the Louisiana Tank Truck Carriers. Hydro-Walk's application was then taken under advisement.
By a 4-1-0 vote, Hydro-Walk's application was granted at the open session of the Commission's Business Executive Session of June 29, 1988. Order No. T-17908 was issued thereafter on July 15, 1988, stating that "[i]n view of the evidence present in the record after hearing in the matter, the Commission finds that a grant of the authority sought would be in the public interest."
Dupré and the Louisiana Tank Truck Carriers applied for reconsideration of the July 15, 1988 order. Their application claimed the additional services of Hydro-Walk was not needed as 1) existing carriers provide all the service that is necessary; 2) existing carriers have idle equipment and are willing and able to provide services to Hydro-Walk's five named shippers; 3) the named shippers had previously used the protestants' services, all without complaint; 4) the five named shippers have tendered little traffic to Louisiana's common carriers; 5) the geographical area discussed at the hearing was only the Shreveport area, not statewide, as permitted by Order No. T-17908; and 6) the depressed economic climate has decreased business and revenues so that protestants need more business, not more competition. The application for reconsideration was denied, however, by a 4-0-1 vote on September 15, 1988. (Order No. T-17908-A.)
Thereafter, four carriers, Dupré, Stephens, Jocto and Groendyke, filed suit in the Nineteenth Judicial District Court against defendant PSC, seeking reversal of PSC Order No. T-17098. LSA-R.S. 45:1192. They claimed the PSC erred in granting the carrier permit because the decision is contrary to the law and evidence presented at the hearing. Their argument in support essentially asserted the same claims raised in the rehearing application of Dupré and the Louisiana Tank Truck Carriers to the PSC. The Commission answered, asserting the validity of its action. To protect its operating rights, Hydro-Walk intervened.
The parties filed briefs and stipulated the appeal was to be submitted for decision on the transcript, evidence and exhibits previously compiled and introduced in the PSC hearing of May 17, 1988. Oral arguments were held on April 6, 1989. At the conclusion, the district court determined the PSC acted arbitrarily and capriciously in issuing Order No. T-17908. Consequently, the contract carrier permit was revoked in its entirety and the PSC order annulled.
The court's oral reasons recognized the PSC was not authorized to issue a contract carrier permit unless doing so was "in the public interest." LSA-R.S. 45:164. The court also observed it was to uphold the PSC's decision unless it was based on an error of law or is one which the PSC could not have found from the evidence presented, citing CTS Enterprises, Inc. v. Louisiana Public Service Commission, 540 So.2d 275 (La.1989), and Southern Sugar Transport, Inc. v. Louisiana Public Service Commission, 324 So.2d 435 (La.1975).
Following the mandate of CTS Enterprises, the reviewing court considered the evidence on record of the number of shippers to be served by Hydro-Walk, the nature of Hydro-Walk's proposed services, the effect which granting the permit would have upon the services of the protesting carriers, the effect which denying the permit would have upon Hydro-Walk and its shippers, and the changing character of the shippers' requirements. From its review, the district court concluded that Hydro-Walk did not present evidence of a need for its particular services and did not show that its entry into the market would not be detrimental to the public or to existing carriers.[3]
*591 By a joint motion, the PSC and Hydro-Walk devolutively appealed the district court judgment directly to this court. LSA-Const. Art. 4 § 21(E).

PRECEPTS
A motor carrier may not operate as a contract carrier unless the PSC issues a permit based upon its finding, subsequent to a public hearing, that issuance of the permit is in the public interest and the applicant has complied with the requirements of LSA-R.S. 45:161-172. LSA-R.S. 45:164; see also Southern Sugar Transp., Inc., supra. Upon judicial review of the Commission's determination of whether the applicant has made a showing that granting the permit would be in the public interest, a court will not upset the agency's finding unless it is based on an error of law or is one which the Commission could not have reasonably found from the evidence. CTS Enterprises, supra.
Issuance of a contract carrier authority must be "in the public interest" and the burden of proof is on the applicant. Id.; Southern Sugar Transp., supra. In determining whether the contract carrier permit is "in the public interest," the PSC should, with less exacting scrutiny, consider the same factors regarding common carrier applicants who must show issuance of a certificate is required by "public convenience and necessity." CTS Enterprises, supra. The PSC should specifically consider 1) the number of shippers to be served by the applicant, 2) the nature of the service proposed, 3) the effect which granting the permit would have upon the services of the protesting carrier(s), 4) the effect which denying the permit would have upon the applicant and/or its shippers, and 5) the changing character of the shippers' requirements. Id.
The standards of proof required of the contract carrier applicant is less stringent than that required of the common carrier applicant. The primary reason is the contract carrier, whose authority is limited in nature, restricted to specific commodities, specific shippers and designed to meet the special needs of the shipping public, has less effect upon the equilibrium of the market place than a common carrier. Id. The difference is reflected in the disparate statutory requirements that a contract carrier need only show issuance of a permit is "in the public interest"; whereas a common carrier must show public necessity and convenience requires the issuance of the certificate. Id.
After reviewing the evidence we conclude, as did the district court, that even with the lesser standard applicable to contract carrier applicants, Hydro-Walk failed to sustain its burden of proving issuance of the contract carrier permit is in the public interest. The following summary of the record reflects Hydro-Walk made was no showing that its prospective shippers found existing carriers inadequate or that the existing carriers could not meet the particular needs of the prospective shippers. Rather, the evidence showed only the shippers preferrence for Hydro-Walk's services and the depressed state of the petroleum products transportation market.

HYDRO-WALK'S CASE
At the commission hearing, Hydro-Walk's president, Ronald G. Walker, testified *592 his business is wholesaling, buying petroleum products from refineries and terminals and selling them to truck stops and service stations around Shreveport, Texarkana and East Texas. Hydro-Walk sells to three of its potential shippers, Ida, Clements and Bayou State. Under its interstate authority, Hydro-Walk also hauls for three or four of its prospective intrastate shippers.
The company's office and terminal are located in Greenwood, near Shreveport. It operates twenty-four hours a day, seven days a week. The company employs three full-time drivers and owns three tractors and six trailers. At present, none of its units have been set aside for the transportation of crude oil.[4]
Hydro-Walk seeks authorization to haul intrastate for hire. If issued the permit, Walker stated Hydro-Walk would act primarily as a back-up to its prospective shippers' equipment. Hydro-Walk plans to concentrate its efforts on smaller convenience store operators, such as its prospective shippers, so that "when things are slow on [Hydro-Walk's] end and there's [sic] may be real busy we'll be taking their overflow, trying to help out any time we have a truck that has slack time, delivering product [sic] for them for their own locations wherever they designate us to go to deliver that product." (Transcript, p. 5.)
Walker admitted his business had decreased. Only fifty-five percent of Hydro-Walk's equipment is being utilized. He assumed the business of carriers in the area is also depressed. Walker did not anticipate his wholesale market increasing, preventing him from meeting the back-up needs of his prospective shippers. If necessary, he is willing to hire additional drivers.
The first of Hydro-Walk's five supporting shipper witnesses to testify was Grady Staggers, President of Staggers Oil Company of Louisiana, Marshall, Texas. Staggers Oil operates convenience stores selling gasoline and diesel fuel under the name of Texaco in Texas and Shell in Louisiana. All eight of its Louisiana stores are located in the Shreveport area.
Staggers met Walker after Staggers Oil purchased two stores from a Lake Charles chain which purchased petroleum from Hydro-Walk. Staggers Oil continued purchasing petroleum from Hydro-Walk, until the stores began operating under the name Shell, and Staggers Oil started hauling for itself. Staggers complemented Hydro-Walk's expeditious service. Often, the stores needed products immediately, due to their limited storage capacities, and could not wait twenty-four hours for a shipment.
Staggers Oil has one transport with which it supplies petroleum and petroleum products to its twenty-five stores. Recently, several stores were acquired. Consequently, Staggers recognized that one transport working three shifts, seven days a week would be impracticable for hauling from Arcadia, Louisiana to Shreveport and from Waskom, Texas to Longview and Marshall during the peak summer months. To date, he had never called upon a Louisiana intrastate carrier, although he has used Texas carriers. Staggers has not consulted the yellow pages or contacted the PSC to inquire which Louisiana intrastate carriers have terminals available in the Arcadia area.
Hydro-Walk's second shipper witness was Gary Northern, vice-president of Ida Gasoline Company located twenty-five miles north of Shreveport. Ida blends gasoline stocks into finished motor gasoline, selling to retailers, wholesalers and jobbers. It operates six transports but often needs the services of outside carriers.
Ida uses Hydro-Walk to haul interstate from Waskom, Texas. It would prefer using Hydro-Walk intrastate and hauling from Pennzoil's Atlas Refinery in Shreveport. But, as Hydro-Walk is not licensed to haul intrastate, Ida buys Texas products. Northern testified that Hydro-Walk *593 has always worked expeditiously, delivering approximately sixty loads a month, with a two or three hour delivery time per load. Ida prefers using Hydro-Walk because, as another small company operator, Hydro-Walk understands its needs. If Hydro-Walk obtained the contract carrier permit, Ida anticipated having Hydro-Walk haul ninety loads a month.
Jocto, one of the protestant carriers, provides Ida with adequate common carrier services by hauling products out of Baton Rouge to Ida's Shreveport plant. Ida does not use any of the other protestant carriers. In the past, Dupré has sought Ida's business. But Ida will not patronize Dupré because Cajun Energy, the sister company of Dupré, competes with Ida by selling to the same convenience stores. Protestant Stephens has also sought Ida's business. A few years back, Stephens adequately serviced Ida by committing a truck to haul for it once a day. Northern testified that when Ida needed three loads a day by midnight, however, Stephens could not meet Ida's needs.
The third shipper witness to testify was Robert Clements, president of Clements Oil Corporation located in Atlanta, Texas, about fifty-four miles north of Shreveport. Clements Oil has two bulk plants, one in Atlanta and one in Mansfield, Louisiana. It also has two convenience stores in Coushatta and one in Mansfield. Clements Oil has used Hydro-Walk to haul interstate for its convenience stores and bulk plants. Clements appreciates a carrier which transports expeditiously.
Clements Oil wishes to use Hydro-Walk's services for its overflow work when drilling increases during the summer months. Most of its own equipment, three trucks, four transport trailers and four vans, are used for its commercial industry account. Clements testified that in the last six months, his company has used intrastate carriers twice, but he did not recall the names of the carriers. Clements Oil hopes to increase its needs with the expected summertime oilfield increase, but Clements admitted his company's needs are speculative.
Daryl Drago, the area supervisor foreman for Pel State Oil, was the fourth shipper witness called to testify. He stated that approximately thirty of Pel State's stores are located in the Shreveport area, but the company has only one driver and transport for that area. Expeditious delivery of its products is consequential. If a transport breaks down or one of its stores has an incorrect stick reading creating an urgent need, Pel State wants a carrier who can deliver quickly. Pel State has found that if it uses a carrier infrequently, that carrier is not as willing to provide prompt, immediate service.
Drago testified Pel State was not interested in using protestant carrier Dupré. The company considered Dupré a competitor because the Dupré family operates Canal Stores, a chain of convenience stores. In the Baton Rouge area, Pel State uses protestant Stephens and is very satisfied with its performance. Nevertheless, Stephens has not been requested to service the Shreveport area stores even though its base terminal is in Bossier City. Since Stephens had not proven itself in the Shreveport area, but Hydro-Walk has proven itself through its interstate deliveries, Pel State wants to continue using Hydro-Walk's Shreveport area services.
The last witness to testify in support of Hydro-Walk's application was Wayne Taylor, manager of crude oil at Bayou State Oil Corporation located on Highway 71, a mile from the Arkansas border. Bayou State is primarily an oil producer and a marketer of crude oil. Until a few months before the hearing, Bayou State had three transports. Prior to the hearing, though, Bayou State eliminated one of the transports. With only two remaining, it needed a back-up carrier for occasions when one of the two transports broke down. Nevertheless, Taylor had not contacted the PSC to discover which carriers were available in the Shreveport area.
Bayou State's business peaks during the last ten days of the month. It did not have sufficient volume for three transports, but often has more than enough for two. Bayou State wants Hydro-Walk as a back-up *594 and to handle inventory overflow while its own transports are in the field gathering crude.
In the past, Bayou State used the services of a Louisiana carrier, James Davison. Davison is now in the crude oil business; thus, he is a competitor. When Bayou State operated its refinery, it used common carriers such as Wheeling and protestant Stephens. Taylor remarked that common carriers did not appear to be interested in transporting crude oil, as none had solicited his business.

PROTESTANTS' CASE
Lela Sisk, traffic manager for Stephens Truck Line, Inc., was called as the protestant's initial witness. She testified that Stephens has intrastate authority to transport petroleum products, in bulk, and to transport oil field machinery, equipment and supplies between all points in Louisiana. The company's principal terminal is in Bossier City, but it also has terminal facilities in Baton Rouge and Lake Charles. The Bossier City terminal has fifteen tractors and sixteen trailers; the Baton Rouge terminal has twenty-one tractors and thirty-one trailers; the Lake Charles terminal has twelve tractors and fourteen trailers; and the New Orleans area also has equipment. Until 1987, four of Stephens' units were dedicated to transporting crude oil.
Except for a surge in 1985, Stephens' revenues have been down from the highs it reached in 1980. Statewide, Stephens has between two hundred-thirty and two hundred-forty customers and uses eighty-five percent of its equipment. Stephens actively seeks new clients. Sisk testified that large companies are not given preferential treatment to the detriment of Stephens' smaller-sized clientele. Stephens accommodates short lead-time requests and does not require daily shipments from its customers.
Regarding Hydro-Walk's prospective shippers, Sisk was asked whether Stephens had solicited the various shippers named on Hydro-Walk's application. Sisk testified that Bayou State had been called prior to Stephens dispensing with its crude transports. Pel State had also been contacted regarding service for its Shreveport stores, but Stephens had not received a response. Ida, Clements Oil and Staggers Oil had not been solicited. Sisk was unaware that Staggers Oil had purchased stores in Louisiana. Stephens transports out of Arcadia on a regular basis and could accommodate the needs of Staggers Oil. Stephens' Bossier City terminal is located twenty-five miles from Ida's location. Stephens could accommodate Ida's short-notice buy needs and its ninety loads a month.
Stephens also has the capacity to service the needs of Clements Oil, in Mansfield, forty miles from Stephens' terminal. Sisk thought Clements Oil was handling its own needs and had not known that it was having products carried intrastate. Additionally, to handle the needs of Bayou State, Stephens is willing to dedicate a unit for the transportation of crude oil.
J. Jeansonne, a consulting and sales representative for Jocto, was the second witness to testify on behalf of protestants. Jocto is a common carrier with intrastate authority to haul petroleum products, solvents and gasohol, to and from all points in Louisiana. It has forty transports and has terminals in Kenner, Eunice and Arcadia. Seven of its transports are in Arcadia, and Jocto has the ability to move in additional units.
Jocto opposes Hydro-Walk's application because it needs the additional business. Jocto's expenses are high due to its substantial investment in personnel, equipment and terminal hardware. It cannot risk losing potential clients or existing business.
Jocto utilizes only eighty-five to ninety percent of its equipment. Its unused equipment could handle the back-up needs of the shippers supporting Hydro-Walk's application. Jocto came into being by hauling for small jobbers. It would appreciate the additional business of hauling one load for a small company so that it could keep its transports working continuously. Moreover, because its terminals cross-section the state, it can accommodate their short lead-time. Jocto's idle equipment is ready, willing and able to service the needs of Hydro-Walk's supporting shippers.
*595 John Dupré, governmental affairs representative for Dupré Transport, was the third witness to testify on behalf of the existing carriers. He testified that Dupré Transport is a common carrier authorized by the PSC to transport statewide, petroleum, petroleum products, crude oil, ethanol, alcohol used in the blending of gasolines, fertilizers and related products. Dupré has sixty-six tractors and ninety-five trailers located throughout the state at terminals in Church Point, Lake Charles, Pineville, Bossier City, Monroe, Baton Rouge, Chalmette and Houma.
The company's expenses are high. Its insurance alone is five million dollars a year. It also has an expensive safety program which has a safety supervisor who conducts bi-monthly meetings with the Dupré drivers.
Dupré Transport utilizes about eighty-five percent of its equipment. As it could use more business, it actively solicits shippers. Its Bossier City terminal is convenient to the shippers supporting Hydro-Walk's application. Both Staggers Oil and Clements Oil were solicited. Dupré would also like to haul Ida's ninety loads a month as well as Clements' two loads a month. To service Bayou State, it is willing to dedicate a transport for hauling crude. In response to the witnesses for Ida and Pel State who testified their companies did not wish to patronize Dupré because other Dupré family members own Canal Refining Company, Dupré stated Dupré Transport hauls for other competitors of Canal Refining. Moreover, the company has not received complaints concerning the service the competitors have received.
The fourth witness to testify on behalf of the protestants was Fred Hughes, the Baton Rouge terminal manager for Groendyke Transport. He testified that Groendyke holds intrastate authority to haul commodities, in bulk, statewide and is also authorized to haul interstate. Sixty to sixty-five of its seven hundred-fifty transports are located in Louisiana. More units can be moved into the state if necessary, but presently only eighty to ninety percent of its equipment in Louisiana is utilized.
Groendyke's Louisiana terminals are located in Lake Charles, Baton Rouge and New Orleans. Its closest terminal to Shreveport, though, is in Longview, Texas, sixty miles out of Shreveport. That terminal has forty transports. Groendyke owns approximately fifty percent of its transports, lease operators own the others. Its insurance premiums run in the millions of dollars and its operating expenses are continuing to increase. Its revenues, however, went down in 1987, but experienced a slight rise in the first quarter of 1988.
Hughes stated that Groendyke needs more business than it presently has. Groendyke prides itself on its expeditious moves and will accommodate the needs of its shippers.
The last witness to testify on behalf of the protestants was F.J. Tillery, Director of Marketing for Younger Brothers, Inc., and president of the Louisiana Tank Truck Carriers. Younger Brothers is authorized to haul petroleum, petroleum products and liquid commodities, in bulk, statewide. It also has interstate authority for the forty-eight states. Its terminals are in New Orleans, Baton Rouge and Lake Charles. It has ninety-seven transports, statewide, which are forty percent owned by the company and sixty percent owned by lease operators. Its insurance premiums aggregate over five million dollars.
Tillery testified that revenues were down for the first quarter of 1988 as compared to the first quarter of 1987. Intrastate, its equipment is only seventy-five to eighty percent utilized. Younger Brothers needs more business and can handle both small and large shipping customers. Any customer Younger Brothers has is important, regardless of its size. The only problem with short lead-time tenders is the location of the transport units at the time of the shipper's tender. But to accommodate the needs of the testifying shipper witnesses, Younger Brothers is willing to locate transports in northwest Louisiana.
Tillery also testified that on behalf of the thirty members of the Louisiana Tank Truck Carriers Association, several of which are domiciled in the Shreveport area, *596 he opposes Hydro-Walk's application. Existing carriers have the equipment and availability to take care of the needs of the shippers supporting Hydro-Walk's application.

APPLICATION OF THE PRECEPTS TO THE EVIDENCE
The PSC could not reasonably have found from the evidence that Hydro-Walk carried its burden of proving issuance of the contract carrier permit was "in the public interest." Consequently, we affirm the district court's judgment. The contract carrier permit was properly revoked in its entirety and PSC Order No. T-17908 was correctly annulled.
Hydro-Walk did not show its five prospective shippers lacked access to existing carriers or existing carriers could not serve their particularized needs. Also, there is no evidence showing entry of an additional carrier into the market would not be detrimental to the public or to existing carriers.
Hydro-Walk's case established its desire to enter the intrastate market by serving as a back-up carrier to five small companies and/or convenience store operators. Its testifying shipper witnesses established their preference for Hydro-Walk's services. Shipper preference alone, however, is not a consideration in the issuance of carrier authority. CTS Enterprises, supra.
Witnesses for the prospective shippers universally testified concerning their requirements of expeditious deliveries made with little advance notice. They preferred Hydro-Walk because, as their needs would be sporadic, they felt their infrequently placed orders would receive better service from a small carrier like Hydro-Walk. The witnesses lacked confidence their orders would receive treatment equal to that which the large carriers gave their steady customers. Accordingly, a few of the shipper witnesses did not even investigate the market to find which authorized motor carriers serviced their area.
Conversely, the witnesses for the protestant carriers claimed their companies actively sought new clientele, even those with only occasional single-haul needs. They denied giving preferential treatment to large accounts at the expense of their sporadically serviced customers. Witnesses for the protestant carriers agreed the nature of the hauling for hire business is short lead-time tenders with expeditious delivery needs. All witnesses for protestants affirmed that their carriers accommodated such needs.
Hydro-Walk presented no evidence of existing carriers having a history of delays and unsatisfactory service. The disfavorable testimony adduced was limited to Ida's experience that Stephens provides adequate service when it carries one load a day, but not when it carries three loads a day. Ida's service complaint against Stephens, though, was a brief, conclusory allegation without factual specificity or documentation. The remaining negative testimony amounted to declarations from the witnesses for Pel State and Ida regarding their companies' decisions not to patronize their competitor, Dupré.
Ida's complaints against Stephens, and Ida and Pel State's determination not to use Dupré did not, however, reflect upon or call into question the qualifications of the remaining available carriers. Bayou State had used the services of Stephens in the past without complaint, as well as those of non-protestant carriers, Davison and Wheeling. Moreover, Ida and Pel State presently use the services of Jocto and Stephens in central Louisiana without service complaints. Likewise, Clements Oil has used unnamed existing carriers without experiencing inadequate service.
In protest of Hydro-Walk's application, representatives of the existing carriers demonstrated their capabilities and willingness to service the back-up needs of Hydro-Walk's prospective shippers. Stephens and Dupré agreed to set aside a transport for hauling crude for Bayou State. To acquire the shippers' business, the representative for Younger Brothers testified concerning his company's willingness to locate transports in the Shreveport area. Further, Stephens, Dupré and Jocto presently have terminals with numerous transports *597 centrally located to the shippers' Shreveport area businesses.
The protestant carriers have under-utilized equipment, ranging from ten to twenty-five percent of their transports. Their equipment is idle as a result of Louisiana's depressed oil industry. The additional revenues these prospective shippers offer might be the revenues which provide the economic feasibility for some or all of the existing carriers to remain in business. Moreover, allowing Hydro-Walk to enter the market would reduce the sporadic revenues these shippers currently provide existing, non-protestant intrastate carriers. Its entry might also prevent the expansion of Jocto and Stephens' services for their present customers, Ida and Pel State. As the PSC is obligated to protect existing carriers, the PSC should have given greater consideration than it did to the detrimental effect an additional carrier would have upon existing carriers.
Hydro-Walk failed to prove a need for its particular services or to show granting its application would not be detrimental to the public or existing carriers. Hydro-Walk's proposed back-up services merely duplicate those available from existing carriers. No evidence showed the inadequacy of existing carriers or the characteristics of Hydro-Walk which would distinguish it from existing carriers. Consequently, denying Hydro-Walk's application will have no apparent adverse effect upon its prospective shippers.
For the reasons assigned, the judgment of the district court is affirmed.
AFFIRMED.
WATSON, J., dissents and assigns reasons.
WATSON, Justice, dissenting:
The trial court erred in substituting its judgment for that of the Louisiana Public Service Commission. A court should not upset a finding by the Public Service Commission unless it is based upon an error of law or does not have a reasonable evidentiary basis. Scotty's Vacuum Service, Inc. v. Louisiana Public Service Commission, 450 So.2d 1303 (La.1984); CTS Enterprises, Inc. v. Louisiana Public Service Commission, 540 So.2d 275 (La.1989).[1]
Compensated carriage of persons or property by motor vehicles is a business "affected with a public interest." Therefore, it is governed by uniform and reasonable regulations which are intended to: protect the public and the public highways; minimize inconvenience to other motorists; prevent irresponsible operation; minimize congestion; and give the public the most inexpensive and efficient means of transportation while fostering sound economic conditions among carriers. LSA-R.S. 45:161. A permit to operate as a contract carrier cannot be issued unless it is in the public interest. LSA-R.S. 45:164.[2]
The factors to be considered in determining public convenience and necessity for common carrier authority include a public purpose, responsiveness to a public demand or need, the adequacy of existing carriage, any prejudice to existing carriers and the effect on the public roads and other users.[3]Miller Transporters, Inc. v. Louisiana Public Service Commission, 518 So.2d 1018 (La.1988). The same considerations are pertinent to common and contract carrier applications, but the evidentiary requirements for a contract carrier permit are less stringent. CTS Enterprises, supra.
A permit to serve five unnamed shippers, the maximum number allowed by law, is *598 close to being a permit for common carriage. CTS Enterprises, supra. However, when existing common carriers do not have the business a contract applicant proposes to handle, there is no presumption that the existing carriers will be adversely affected. See Interstate Commerce Commission v. J-T Transport Co., 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961).
If delivery time is vital to a shipper's operations, prompt service by a carrier fills a special need, which is not necessarily satisfied by adequate service. Truck Service, Inc. v. Louisiana Public Service Commission, 256 La. 343, 236 So.2d 491 (1970). Specialized equipment or expertise can make a carrier's permit a matter of public interest. See Ken-Go Services, Inc. v. Louisiana Public Service Commission, 483 So.2d 141 (La.1986). The public's interest in a new service must be weighed against the effect of that service. CTS Enterprises, supra.
Relying on CTS Enterprises, the trial court was influenced by the fact that Hydro-Walk has a permit to service five named shippers. The trial court failed to consider the significant difference between a permit to serve five unnamed shippers, which is close to common carrier authority, and permission to serve five named shippers, a more restricted permit.
Hydro-Walk is located near the Louisiana-Texas-Arkansas borders and wants to supplement deliveries of its own product and deliveries under its interstate permit with regional carriage for the five named shippers. Hydro-Walk has a geographical service advantage over Younger Brothers and Groendyke because of its proximity to Arcadia and Shreveport. If Groendyke serviced the supporting shippers in northwest Louisiana, it would do so from Longview, Texas, an interstate carriage for which Hydro-Walk is already licensed. Pel-State has satisfactory service from Stephens in the Baton Rouge area and is interested in using Hydro-Walk only in the Shreveport area. The trial court gave no weight to the regional considerations which would make Hydro-Walk more responsive to the needs of its five named shippers.
On the issue of adequate service, Staggers Oil Company had once been unable to obtain an outside carrier. In addition, there was testimony from two of the shippers that protestant Stephens had not met their needs. Dupré competes with three of the named shippers, and the shippers have an understandable reluctance to use Dupré as a carrier. Prompt service is a key consideration for the shippers which must react quickly to price changes. Hydro-Walk can provide a speedy competitive response.
It is not feasible to use the same equipment for crude oil, diesel and gasoline. None of the protesting shippers presently have equipment dedicated to serve Bayou State's crude oil business. Hydro-Walk will provide transportation for crude oil which is not currently being offered by the protesting carriers. To this extent, Hydro-Walk would be providing an intrastate service, not presently available, which is in the public interest.
Bayou State has reduced its trucking fleet from three to two. Since its volume justifies two and one-half trucks, it is more economical to have Hydro-Walk handle the surplus. Pel-State only has one transport and has not replaced a second driver. The company apparently has determined that it would be more efficient to have Hydro-Walk take care of the hauling which had been done by the second driver. In replacing equipment that was not fully utilized, Hydro-Walk is fostering more efficient transportation.
Hydro-Walk handles its own transportation needs and hauls for three of the named shippers under its interstate permit. Since Hydro-Walk utilizes its equipment at 55% of capacity, it would reap a financial benefit from doing occasional intrastate hauling for its five shippers.
The trial court noted that Hydro-Walk intends to provide backup services to the five shippers, all of which operate their own transportation systems. Because the backup business is needed only at certain times, it would not be a steady or dependable source of revenue. While this consideration weighs against a need for the permit, *599 it also indicates that the economic impact on existing carriers would not be significant. Two of the protesting shippers, Groendyke Transport and Younger Brothers, only have terminals in southern Louisiana and should not be materially affected by the permit granted to Hydro-Walk. Since Hydro-Walk has ample surplus capacity, its supplemental service should not require additional investment.
While the applicant did not make a strong showing that its intrastate services are in the public interest, this must be balanced against the fact that the shippers require only supplemental transportation. None of the protesting carriers have the business Hydro-Walk proposes to handle. Although the protesting carriers have a general need for more business, they did not specify any detriment to their financial stability from Hydro-Walk's intrastate permit. The effect on the existing carriers could not be great, because no business is being diverted from them.
The authority granted by the Public Service Commission will serve a public purpose in expediting prompt delivery of gasoline to give consumers the maximum benefit of any price reductions. The public will also benefit from more efficient transportation. While the existing carriers might serve some of the supporting shippers' needs, any prejudice to the existing carriers should be minimal. Hydro-Walk's small backup operation will have little effect on other highway users or the public roads.
Viewing the substantial evidence in the less stringent light required for contract carrier applications, the Louisiana Public Service Commission was not arbitrary and capricious in granting Hydro-Walk intrastate authority to transport for five named shippers.
I respectfully dissent.
NOTES
[1] Regulated motor carriers are divided into two classes, common and contract, by LSA-R.S. 45:162(5) and (7). In Louisiana, a "common carrier by motor vehicle" is defined essentially as a person in business of transporting persons or property for compensation and available to the public generally, whereas a "contract carrier by motor vehicle" is any person not a common carrier who transports passengers or property by vehicle for compensation under special and individual contracts or agreements. CTS Enterprises v. Public Service Commission, 540 So.2d 275, 278 (La.1989); LSA-R.S. 45:162(5) and (7).
[2] LSA-R.S. 45:162(5) creates a presumption that a carrier with more than five contract shippers is really a common carrier. Consequently, Hydro-Walk's application implies that it seeks a permit to transport for the maximum number of shippers permitted to contract carriers. See CTS Enterprises v. Public Service Commission, 540 So.2d 275, 280 n. 7 (La.1989).
[3] Consistent with the principles outlined in CTS Enterprises, the district court found the nature of Hydro-Walk's proposed services for the five shippers duplicate those provided by the protesting carriers. It noted that all witnesses testified that revenues are suppressed; a new competitor would undoubtedly adversely affect the protesting carriers. The court indicated that even though the PSC order did not so limit Hydro-Walk's authorization, the testimony of the representatives of the prospective shippers revealed Hydro-Walk would provide solely back-up services. Thus, because the shippers were only going to use Hydro-Walk as a back-up carrier, the court concluded denying the permit would have little effect upon Hydro-Walk and its prospective shippers.

The district court also found the evidence did not show Hydro-Walk's potential shippers lacked access to existing carriers which could service their needs. In recent years, the shippers had not attempted to contact existing carriers or the PSC for a list of existing carriers. The evidence also indicated that authorization of a new carrier during the present oil industry depression could seriously affect the economic well-being of existing carriers. Therefore, the district court concluded the PSC acted arbitrarily and capriciously when it determined issuance of the contract carrier permit was in the public interest.
[4] Usually, carriers do not use the same transport to haul crude oil as they would to haul diesel and gasoline. The cost of cleaning the transport after hauling crude is expensive. Carriage of crude also requires a different vapor recovery system and different product loading equipment than that used for carrying refined products.
[1] CTS Enterprises and Scotty's Vacuum Service modified the prior Louisiana standard of review. Southern Sugar Transport, Inc. v. Louisiana Public Service Commission, 324 So.2d 435 (La.1975), had held that the Commission's issuance of a contract carrier permit is not arbitrary and capricious when it is supported by some evidence.
[2] A common carrier must prove that public convenience and necessity require a certificate.
[3] The federal factors were enumerated in 49 U.S.C.App. § 309(b), to-wit: the number of shippers to be served; the nature of the service proposed; the effect upon protesting carriers; the effect of a denial on the applicant and shippers; and the changing character of shipping requirements. The statute was repealed in 1978.