MARCUS, Justice.
This case involves the Louisiana Public Service Commission’s order approving the application for a contract carrier permit to Macro, Inc. (Macro) authorizing transportation of gasoline, diesel fuel, kerosene, jet fuel, solvent and lubricants for Petroleum Helicopters (PHI), Phoenix Petroleum Co. (Phoenix) and Macro Oil Co., Inc. (Macro Oil) statewide.
An application for the aforesaid permit was filed by Macro with the Louisiana Public Service Commission (commission) on August 11, 1988.[1] Opposition to the application was filed by Dupré Transport, Inc. (Dupré), Stephens Truck Lines, Inc. (Stephens), Groendyke Transport, Inc. (Groendyke) and The Louisiana Tank Truck Carriers, Inc. A hearing was held before the commission’s hearing examiner on February 1, 1989. In addition to those carriers filing oppositions, representatives of Jobbers Oil Transport Co., Inc. (JOTCO), C & C Transports, Inc. (C & C) and Younger Brothers, Inc. (Younger) appeared at the hearing and testified in protest to this application (hereinafter collectively referred to as “protestants”). After the hearing, wherein evidence was adduced, the commission issued an order on March 1, 1989, approving the contract carrier permit “conditioned upon the grantee’s full compliance with the law and rules and regulations of the Commission bearing thereon.” On March 29, 1989, the Petition for Reconsideration filed on behalf of Dupré, JOTCO, C & C and Younger was denied by the commission.
Dupré, JOTCO, C & C, Younger and Ray White Trucking, Inc., pursuant to La.R.S. 45:1192,[2] filed a petition in the district *477 court alleging that the decision of the commission was not in the public interest and contrary to the law and evidence adduced at the hearing. Particularly, they alleged that the services requested were adequately being handled by existing carriers. The commission answered, generally denying the allegations of the petition. Macro intervened in the proceeding uniting with the commission in resisting the action of petitioners. After oral argument, the matter was submitted on the record before the commission including exhibits and the briefs filed in the district court. On April 30, 1990, the district court rendered judgment reversing the commission’s order granting the permit, finding that the order was not in the public interest and was thus arbitrary and capricious. The motion for a new trial on behalf of the commission and Macro was denied. The commission and Macro appealed to this court pursuant to La.Const. Art. 4, § 21(E).[3] The commission and Macro contend that the district court erred in overturning the commission’s order granting Macro a contract carrier permit because the evidence presented clearly proved that the issuance of the permit was “in the public interest.”
La.R.S. 45:164 provides in pertinent part: No motor carrier shall operate as a contract carrier without having had a public hearing and obtained from the commission a permit to do so, which permit shall not be issued unless in the public interest and until the applicant shall have complied with the requirements of R.S. 45:161 through R.S. 45:172.
In determining whether the contract carrier permit is “in the public interest,” the Public Service Commission should, with less exacting scrutiny, give consideration to the same factors to be found in the jurisprudence regarding the common carrier applicant, including the effect of the grant of carrier authority on existing carriers, shippers and road users. CTS Enterprises, Inc. v. Louisiana Public Service Commission, 540 So.2d 275, 283 (La.1989) (hereinafter referred to as CTS 7)[4] The “less stringent” standard is applied to contract carrier applications primarily for the reason that the contract carrier has less effect upon the equilibrium of the market place and the contract carrier authority is more limited in nature, restricted to specific commodities, specific shippers, and designed to meet the special needs of the shipping public.[5] The commission should also specifically consider the following criteria when assessing contract carrier applications: (1) the number of shippers to be served by the applicant, (2) the nature of the service proposed, (3) the effect which granting the permit would have upon the services of the protesting carrier, (4) the effect which denying the permit would have upon the applicant and/or its shippers, and (5) the changing character of the shippers’ requirements. CTS I, 540 So.2d at 283. With respect to the burden of proof, it is on the applicant. Dupré Transport, Inc. v. La. Public Service Commission, 556 So.2d 588, 591 (La.1990) (hereinafter referred to as Dupré I);[6] CTS I, 540 So.2d at 280. Upon judicial review of the *478 commission’s determination of whether the applicant has made a showing that granting a permit would be in the public interest, a court will not upset the agency’s finding unless it is based on an error of law or one which the commission could not have reasonably found from the evidence. Dupré I, 556 So.2d at 591; CTS I, 540 So.2d at 277-78. Consistent with the principles set forth above, we will examine the case before us to determine whether the commission could have determined, acting reasonably on the evidence before it, that issuing Macro a contract carrier permit was in the public interest.
Macro, the applicant, represented by Richard G. McElligott, its secretary-treasurer, is presently performing intrastate transportation services for Macro Oil, a distributor for over 55 years of oil and oil related products. McElligott testified at the hearing before the commission that Macro, a subchapter S corporation, is the trucking part of the business which has been in existence since 1976. Both companies are based in Lafayette, Louisiana. Macro operates nine transport tanker trucks and has ten employees. The business relationship between the two companies is such that Macro takes title to the product when it picks it up at a refinery or terminal, retains title during transport and until delivery, at which time title is transferred to Macro Oil. Macro Oil in turn sells it for end use or keeps it for self-consumption.[7] Currently, Macro hauls, between gasoline, diesel, solvent, lubricants and jet oil, about 36 million gallons a year (about 4500 loads) under this arrangement with the parent company as a private carrier. The company’s nine trucks are utilized at full capacity. McElligott testified that Macro was founded when its parent company found that it could not rely upon existing carriers to adequately deliver its product. Currently 95% of Macro’s business is done with Macro Oil. Customers of Macro Oil have been pleased with the hauling services provided by Macro and would like to use Macro’s services as a carrier even when they do not purchase products directly from Macro Oil. If the contract carrier permit were granted, Macro would be more efficient by being able to backhaul products and thus eliminate empty trucks on the road.
McElligott also testified on behalf of Macro Oil in its capacity as a supporting shipper. From Macro Oil’s standpoint, if the permit were granted, Macro Oil would be able to eliminate the massive paperwork between the two corporations which results from the current relationship. He testified that besides using Macro as its carrier, Macro Oil has also used Dupré as a carrier.
Timothy W. Dean of PHI was the second supporting shipper who testified at the hearing on behalf of Macro. The company has approximately 320 helicopters and five airplanes with 75% of its fleet based in Louisiana. The company consumes about a million gallons of turbine fuel a month. Its primary vendors in Louisiana are Macro Oil and Exxon. Dean testified that because the company does not have the capacity to maintain a large volume of fuel at its bases, it often needs fuel on short notice, and in the four years that PHI has been doing business with Macro Oil, it has gotten excellent delivery service from Macro in terms of times and dates exactly when it needed delivery. PHI also requires the trucks which carry the fuel to be clean and well maintained to insure that a good product is going into its helicopter tanks. While doing business with Macro, Dean testified that PHI has never had any problems, Macro’s trucks are clean and well maintained, the employees are courteous and the company has given “tremendous” service. PHI has used other carriers over the years including some of the protestants and currently uses Dupré for some of its hauling needs. PHI introduced into evidence, over the objection of protestants, a document listing eighteen complaints with *479 Dupré’s intrastate performance during the three months prior to the hearing. If Macro were granted a permit, PHI would use it to haul fuel purchased from Exxon in addition to hauling of products purchased from Macro Oil.
The third supporting witness was Stephen Wang of Phoenix. Phoenix’s business in Louisiana includes the sale of diesel fuel to the Regional Transit Authority (RTA) and the sale of kerosene to ICG Railroad with plans to expand into the sale of gasoline to the RTA. Macro is the only motor carrier service it has used in Louisiana to haul diesel fuel purchased from Macro Oil for sale to the RTA, having used barges as its other means of transportation. Wang testified that both his company and RTA have been completely satisfied with Macro’s ability to deliver on short notice since the RTA has limited storage. Phoenix intends to grow and expand in Louisiana, having recently been awarded a contract to supply gasoline to the RTA, and it would like to be able to depend upon Macro’s excellent carrier service.
Six certified common carriers appeared at the hearing and testified in protest to the application. JOTCO of Kenner currently operates 39 units that are capable of transporting gas, diesel and jet fuel and could use more business. JOTCO alleged that the current market for certified carriers is shrinking and the additional authority in favor of Macro would further reduce the market. JOTCO has never served Phoenix but has served Macro Oil in the past and last served PHI in 1980. Groen-dyke has several terminals in Louisiana and is both an intrastate and interstate common carrier. It operates sixty units in Louisiana serving over 150 accounts. The general manager of Groendyke’s Baton Rouge terminal admitted there were occasions when it would refuse a call for service due to the unavailability of equipment with some deliveries being delayed due to scheduling or short-notice contacts. The president of C & C testified that his company has statewide authority to haul petroleum products. His company does not provide services for any of the supporting shippers presently but has done business with Macro and Phoenix in the past. At some times during the year, all of C & C’s eleven units are in use and the company could possibly have to refuse service if requested during this time. Younger has five units dedicated to the delivery of petroleum related products statewide. It does not service any of the supporting shippers. The director of marketing for Younger admitted there may be occasions when it would have to refuse calls for service due to equipment being used and depending upon the time of the year. Stephens currently operates a total of 50 vehicles servicing over 150 accounts in Louisiana and has provided service for PHI and Macro Oil in the past. The traffic manager for Stephens testified that there have been occasions when service has been delayed or refused especially on short notice calls of less than twenty-four hours. The last protesting carrier was Dupré, represented by its vice president. It operates throughout the state with 99 tractors. 80 to 90% of its business is the transport of petroleum products. Dupré is the only protesting carrier that currently serves both Macro Oil and PHI. Although PHI did complain about eighteen instances of service-related problems, Dupré contends that this is a small number of complaints in relation to its total operations with PHI since Dupré performs 80 to 90% of PHI’s business. Dupré admits to some instances where service may have been refused due to equipment not being available when called for, but Dupré has refused no loads and has either rescheduled or delayed deliveries of products. All of the protesting shippers testified that expenses have increased and they could use more business.
Applying the five criteria set forth in CTS I to the evidence presented in the instant case, we think the commission could reasonably have found that granting the permit to Macro was in the public interest and should be upheld.
The first criterion is the number of shippers to be served by the applicant. The larger the number of shippers to be served by the applicant, the greater the carrier’s impact on the economic equilibrium of the *480 industry and the higher the applicant’s burden of proving that the permit is in the public interest. CTS I, 540 So.2d at 282. Macro proposes to serve only three named shippers. The instant situtation is somewhat unique since one of the proposed shippers is the parent company of Macro and Macro currently provides most of the shipping needs of that company. Although there is no clear line of demarcation as to the number of shippers that is acceptable, a permit requesting authority for three named shippers, one of which is the parent company, is clearly a narrow one and the impact on the industry based on this criterion is minimal.
The second criterion is the nature of the service proposed by the supporting shipper. Consideration must be given to the specialized transportation requirements of the supporting shippers, the manner in which the applicant proposes to satisfy them, and whether they may be satisfied equally as well by the protestants. CTS I, 540 So.2d at 282. The standard is not whether the service provided by existing carriers is reasonably adequate, but rather, whether the supporting shippers have a distinct need for a different or a more select or specialized service. I.C.C. v. J-T Transport Co., Inc., 368 U.S. 81, 89, 82 S.Ct. 204, 209, 7 L.Ed.2d 147 (1961). The evidence revealed that Macro Oil established Macro because it was not satisfied with the services it was receiving from existing carriers. Macro Oil would like to eliminate the paperwork associated with the current arrangement and be able to backhaul its products. PHI supported Macro’s application because Macro had provided the specialized service that it needs which is the delivery of jet fuel on short notice since it uses large quantities per day and has limited storage capacity, and the assurance that the jet fuel remain clean and free from contamination. Macro’s trucks were always clean and well maintained while those of other carriers were not. Last, Phoenix testified that its vendee, RTA, needed fuel delivery on short notice due to limited storage and that Macro had supplied that service in the past. Thus, Macro could satisfy the distinct needs of its supporting shippers. Of the six carriers that testified in opposition to the application, five of them admitted that there were instances when service would be delayed or refused, especially on short notice. Such service cannot be said to equal that provided by Macro, which according to the testimony of the supporting shippers, has never failed to meet their specialized shipping needs.
The third criterion is the effect on protesting carriers. When existing common carriers do not have the business a contract applicant proposes to handle, there is no presumption that existing carriers will be adversely affected. Dupré I, 556 So.2d at 598. With the exception of Dupré’s service to PHI and Macro Oil, none of the protestants are currently providing services to the supporting shippers. However, even if the application were granted, it is not clear that the grant would result in a diversion of traffic from Dupré since Macro is currently operating at full capacity and 95% of its private carrier business is with Macro Oil, its parent company. The six protestants currently serve over 500 accounts in Louisiana. Protestants are common carriers that provide intrastate and interstate carriage. While all of them testified that they could handle more business, they failed to provide the commission with concrete evidence demonstrating an adverse effect on their everyday operations.
The fourth criterion is the effect that a denial of the application will have on applicant and its supporting shippers. This effect must be weighed along with the effect on protesting shippers in determining on balance where the public interest lies. See J-T Transport, 368 U.S. at 89, 82 S.Ct. at 209; CTS I, 540 So.2d at 283. One effect on both Macro and Macro Oil would be the inability to eliminate the paperwork resulting from the existing arrangement between the two companies. The desire to streamline the current relationship between shipper and applicant was considered in both CTS II and Dupré II and recognized as a valid reason to support a grant of a con *481 tract permit.[8] Another adverse effect on Macro would be the inability to engage in back hauls, thereby reducing the number of non-revenue producing miles. Both PHI and Phoenix testified that the detrimental effect of the denial of the permit on them would be the inability to utilize the superb service provided by Macro when they purchase products from distributors other than Macro Oil. Taken all of the above factors into consideration, and weighing them against the effect on protestants discussed above, we consider the effect on Macro and its supporting shippers greatly outweighs the effect on protestants and supports a grant of authority to Macro.
As to the final criterion, the changing character of the shippers’ requirements, while neither Macro Oil nor PHI testified concerning any specific changing needs, Mr. Wang of Phoenix testified that his company had plans to expand into both the gasoline and jet fuel market in the coming year which would demonstrate an increased need for Macro’s services in the near future.
After reviewing the evidence presented, and taking into consideration the restrictive number of shippers to be served, the distinct needs of the supporting shippers who cannot be equally serviced by protestants, the minimal effect on the services of the protesting carriers weighed against the substantial effect that the denial of the application would have on applicant and it supporting shippers, and the changing needs of one of the supporting shippers which can be served by Macro, we think the district court erred in overturning the order of the commission. Applying the standard of review applicable in contract carrier cases, that is, whether the commission could reasonably have determined from the evidence that granting a contract carrier permit to Macro was in the public interest, we find that applicant has met its burden of proof and we must uphold the grant of authority to Macro by the commission.
DECREE
For the reasons assigned, the judgment of the district court overturning the order of the Louisiana Public Service Commission granting a contract carrier permit to Macro, Inc. is reversed and set aside. The order of the Public Service Commission approving the application for a contract carrier permit to Macro, Inc. authorizing transportation of gasoline, diesel fuel, kerosene, jet fuel, solvent and lubricants for Petroleum Helicopters, Phoenix Petroleum Company and Macro Oil, Inc. statewide is affirmed.
COLE, J., additionally concurs for reasons assigned.
DENNIS, J., dissents with reasons.

. The original permit requested authority to transport the same commodities for five shippers including Air Logistics and one unnamed shipper. The permit was amended on January 11, 1989, to identify Coastal States Refining and Marketing as the fifth unnamed shipper. On Feb. 17, 1989, (after the hearing) the application was again amended to delete both Air Logistics and Coastal States as designated shippers.

. At the time this petition was filed, La.R.S. 45:1192 provided:
If any of the persons, mentioned in R.S. 45:1191, or other party in interest, shall be dissatisfied with any order entered by the commission, adopting, fixing, changing, altering, or modifying, any rate, classification, rule, charge, or general regulation, the dissatisfied person may, within three months after the order made by the commission becomes effective, file in a court at the domicile of the commission, a petition setting forth the particular cause of objection to the order or regulation of the commission complained of. All such cases shall be tried in the same manner as civil cases and shall be given precedence over all other civil cases in the court, and shall be heard and determined as speedily as possible. The court may affirm the order of the commission complained of, or it may *477 change, modify, alter, or set it aside, as justice may require.

. La.Const. Art. 4, § 21(E) provides:
Appeal may be taken in the manner provided by law by any aggrieved party or intervenor to the district court of the domicile of the commission. A right of direct appeal from any judgment of the district court shall be allowed to the supreme court. These rights of appeal shall extend to any action by the commission, including but not limited to action taken by the commission or by a public utility under the provisions of Subparagraph (3) of Paragraph (D) of this Section.

. This court decided a companion case on the same date, CTS Enterprises, Inc. v. Louisiana Public Service Commission, 540 So.2d 285 (La.1989) (hereinafter referred to as CTS II).

. The difference in the two types of carriage is reflected in the disparate statutory requirements. A contract carrier need only show issuance of a permit is in the public interest whereas a common carrier must show public necessity and convenience requires the issuance of the certificate. La.R.S. 45:164; see also Dupré Transport, Inc. v. Louisiana Public Service Commission, 556 So.2d 588, 591 (La.1990).

. Shortly thereafter this court decided Dupré Transport, Inc. v. Louisiana Public Service Commission, 562 So.2d 910 (La.1990) (hereinafter referred to as Dupré II).

. After the hearing before the commission, The Louisiana Tank Truck Carriers filed a complaint with the commission alleging that Macro is engaged in "for hire transportation” with no authority as a result of the business relationship between Macro and Macro Oil and requested that an investigation be made. An investigation was commenced shortly after the hearing before the commission. Disposition of the matter is not reflected in the record.

. In CTS II, 540 So.2d at 287, the supporting shipper wished to discontinue its present employee/lessor arrangement with the applicant because of the present cost to the supporting shipper of insuring the truck and trucking service. In Dupré II, 562 So.2d at 914, the supporting shippers testified that without applicant’s permit, they would have to continue leasing the applicant's trucks while hiring their own drivers and making other administrative arrangements. In both of these cases, the effect that the denial of the permit would have on the business or administrative relationship between the applicant and the supporting shipper was found to be a valid factor supporting the affirmance of the order granting the permit.